UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

MARILYN BAKER,                                            Case No. 12-CV-2444 (PJS/JSM)

        Plaintiff,

v.                                                                              ORDER

LIFE TIME FITNESS, INC.,

        Defendant.

---

      Ryan H. Ahlberg, AHLBERG LAW, PLLC, for plaintiff.

      Jaime N. Cole and Patrick R. Martin, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., for defendant.

      Plaintiff Marilyn Baker brings this action under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq., against her former employer, defendant Life Time Fitness, Inc. ("Life Time"). Baker, who is black, alleges that Life Time terminated her on the basis of race.[1] This matter is before the Court on Life Time's motion for summary judgment. For the reasons stated below, Life Time's motion is granted.

## I. BACKGROUND

      As is required, the Court recites the facts in the light most favorable to Baker. The Court notes, however, that its task is unusually challenging because Baker's deposition testimony is very difficult to follow. Baker appeared to be unwilling or unable to provide straightforward answers to many of the questions she was asked. Therefore, testimony about any given event is

---

[1] Baker originally alleged that Life Time had discriminated against her in other respects, but she has dropped all claims except those relating to her termination. ECF No. 19 at 1 n.1.

scattered piecemeal over hundreds of pages, and it is often unclear to what meeting or other event Baker is referring. In addition, Baker makes a number of factual claims in her deposition that she did not mention either in her briefing or at oral argument — and, as explained below, she has submitted a sworn declaration in which she contradicts some of her sworn deposition testimony. The Court has done its best to distill Baker's testimony — supplemented by other evidence in the record that Baker does not dispute — into an account that is coherent and that describes the record in the light most favorable to Baker.

*A. Baker's Duties and Life Time's Policies*

Until her termination in July 2010, Baker was a tennis pro at Life Time's Minnetonka location. Life Time hired Baker in 2007 after she interviewed with Mike Johnson, the tennis-department head, and John Brekken, the assistant head. Baker Dep. 40; Brekken Dep. 14-15, 28-29. In 2009, Brekken was promoted to tennis-department head and became Baker's direct supervisor. Brekken Dep. 13.

Baker's duties as a tennis pro included teaching classes scheduled by Life Time, giving private lessons that she scheduled with her own clients, and coaching teams. Baker Dep. 47-48, 62. For private lessons, Baker was paid a percentage of her lesson price, with the rest going to Life Time. Baker Dep. 54, 157-58; *see* Brekken Decl. ¶ 7. For the first six months of 2010, after Brekken became Baker's supervisor, Baker worked more hours than any other tennis pro with the exception of Brekken and the assistant department head. Brekken Decl. ¶ 11 & Ex. 2.

Life Time permits its tennis pros to teach at country clubs and other facilities during the summer, because summer is typically a slow time for indoor tennis. Brekken Dep. 45; Brekken Decl. ¶ 5. But, under Life Time's conflict-of-interest policy, tennis pros must notify their

supervisor and get their supervisor's permission before teaching at other facilities. Baker Dep. Ex. 8 at 20. Life Time requires this advance notice so that it can ensure that it has proper staffing for its summer programs. Brekken Decl. ¶ 5. During her employment at Life Time, Baker received and reviewed a copy of this conflict-of-interest policy.[2] Baker Dep. 79-80, 93, 176.

In support of its motion for summary judgment, Life Time also submitted a document entitled "Life Time Fitness Tennis Leave of Absence Program Agreement." Brekken Dep. Ex. 1. Among other things, the document states that "teaching [Life Time] members who are *not* members of the summer Country Club is contrary to the intent of this mutually beneficial arrangement and hence strictly forbidden." Brekken Dep. Ex. 1 at 1. The document has spaces for the tennis pro and management to sign and states that tennis pros must discuss their summer plans with the department head by March 31, 2010. Baker denies that she was ever given a copy of this agreement or was otherwise made aware of its existence.

### B. Baker's Contact with A.J.

In February 2010, Baker invited A.J., a teenage Life Time member, to join an upper-level boys' tennis class. Baker Dep. 109, 112. At the time, A.J. was a private student of Geoffrey Basham, Life Time's assistant tennis-department head. Brekken Dep. 19, 31-34. Basham complained to Brekken, telling Brekken that A.J. had complained about Baker soliciting him for

---

[2]Baker testified that this policy was superseded during a meeting with Life Time's national tennis manager, who encouraged tennis pros to teach at outside facilities and bring students back to Life Time. Baker Dep. 82-85. Baker did not claim that the manager said that it was no longer necessary to obtain a supervisor's approval, however. In any event, Baker now admits that the conflict-of-interest policy applied to her and has apparently dropped any argument that the policy was superseded. ECF No. 19 at 7 n.5.

private lessons.  Brekken Dep. 32.  Brekken then confronted Baker, claiming that A.J. had made a formal complaint directly to him and accusing her of harassing A.J.  Baker Dep. 114.  Brekken also gave Baker a written warning.  Baker Dep. 114-15.

Baker later spoke to A.J., saying that she "just want[ed] to make sure everything is okay . . . ."  Baker Dep. 115.  When A.J. asked what Baker was talking about, Baker said that she had been told that A.J. had gone to Brekken's office and made a formal complaint of harassment against her.  Baker Dep. 115-16.  A.J. denied going to Brekken's office or making such a complaint and said that he enjoyed Baker's teaching.  Baker Dep. 115.

Baker then went back to Brekken and told him that A.J. was not upset by the invitation to join Baker's class.  Brekken Dep. 33-34.  In response, Brekken admitted that A.J. had not made a formal complaint directly to him and said that he would conduct an investigation.[3]  Baker Dep. 117.  Ultimately, however, Brekken decided that it would be better to give Baker the benefit of the doubt rather than involve a teenage client in a dispute between two tennis pros.  Brekken Dep. 34-35.  Brekken removed the written warning from Baker's personnel file and threw it away.  Brekken Dep. 35.

### C. Baker's Job at Oak Ridge Country Club

In the summer of 2010, another Life Time tennis pro, Barb Meyer, was working as the tennis director at the Oak Ridge Country Club ("Oak Ridge").  Brekken Dep. 47-48.  Meyer had

---

[3]In her deposition, Baker characterizes this as Brekken admitting that "he had made it up and that he had lied."  Baker Dep. 117.  Pressed for details, Baker testified that Brekken specifically admitted that A.J. had not come to him nor made a formal complaint to him.  Baker Dep. 117.  Baker does not refer to this incident in her briefing, and the Court does not understand her to dispute that, whether or not A.J. complained directly to Brekken, Basham told Brekken that A.J. had complained.

previously told Brekken of her work at Oak Ridge, and Brekken knew that she was the director. Brekken Dep. 22, 26, 41, 48.

Meyer hired Baker to teach at Oak Ridge during the summer of 2010. Baker Dep. 60-61. Although Baker reviewed Life Time's conflict-of-interest policy before taking the job at Oak Ridge, she did not tell Brekken about the job as the policy required. Baker Dep. 92-93, 103. Baker claims that Brekken was nevertheless aware of her Oak Ridge job because she talked to a Life Time member about the job while Brekken was in the same room. Baker Decl. ¶ 5.

On May 23, 2010, Brekken was playing in a tennis match at Oak Ridge when he saw Baker giving a lesson to I.G., a Life Time member. Brekken Dep. 38-40; Brekken Decl. ¶ 7. Baker had originally met I.G. at Life Time, where she gave I.G. private lessons. Baker Dep. 126-27, 161. Baker knew that I.G. was not a member of Oak Ridge. Baker Dep. 129.

*D. Meeting and Warning Regarding Oak Ridge*

After seeing Baker giving a lesson to I.G. at Oak Ridge, Brekken arranged a meeting with Baker and Chris Schultheis, Life Time's general manager.[4] Baker Dep. 137. Baker's account of this meeting is particularly difficult to follow, but she appears to contend that Brekken and Schultheis (1) questioned her about how she was paid at Oak Ridge; (2) told her that she should let Brekken know if, in the future, she would be working at an outside facility; (3) told her that it was permissible for her to teach Life Time members outside of Life Time; and (4) asked her to provide them with a list of Life Time members who were training at Oak Ridge.

---

[4]In her testimony, Baker identified the other manager at this meeting as Chris Fazi, whose role at Life Time is not clear. Baker Dep. 104, 156. Baker also identified Fazi as a participant in the later meeting at which she was terminated. Baker Dep. 121. Baker apparently no longer disputes that Schultheis (not Fazi) attended these meetings.

Baker Dep. 93-94, 96-97, 103, 119-20, 134, 141, 156, 162-63.  Baker responded that they should all meet with the general manager at Oak Ridge in order to ensure that she would not violate anyone's privacy if she provided the requested list.  Baker Dep. 94, 132-33.

After the meeting with Brekken and Schultheis, Baker was upset and crying.  Baker Dep. 192-93.  Baker confided to some of her Oak Ridge students, who were also Life Time members, that she was upset because she might be fired by Life Time.  Baker Dep. 102-03, 201.  At least one of the members later complained to Life Time about Life Time's treatment of Baker.  Baker Dep. 206-07.

*E. Later Interactions with Brekken and Written Warning*

Sometime after the meeting with Brekken and Schultheis, Brekken told Baker not to "worry about" providing a list of Life Time members who trained at Oak Ridge.  Baker Dep. 140.  The timing and circumstances of this interaction are unclear, and Baker does not refer to it in her brief.

At some point after telling Baker not to "worry about" the list, Brekken handed Baker a written "Team Member Warning Report."  Baker Dep. Ex. 11; Baker Dep. 120, 122, 140.  The written warning stated that Baker "needs to communicate with tennis department head when working with Life Time members outside of Life Time as well as letting department head know if the pro is working for a country club."  Baker Dep. Ex. 11.  It also stated that Baker "needs to make sure that the courts are scheduled properly in" Life Time's computer system.  Baker Dep. Ex. 11.  The warning contains a place for Baker to sign under the statement: "My supervisor has discussed the above with me.  I understand the contents and acknowledge and understand the corrective action required.  I also acknowledge and understand that if I do not improve my

performance and adhere to the above corrective actions, . . . Termination[] will occur." Baker Dep. Ex. 11.

Brekken asked Baker to sign the warning, but she refused to do so because she believed that it contained false allegations.  Baker Dep. 122-24; Baker Decl. ¶ 10.  At some point, Baker sought clarification from Brekken about the alleged scheduling problem mentioned in the written warning, but did not get very far.  Baker Dep. 138, 164.  Because Brekken did not mention the issue of training Life Time members outside of Life Time during this brief interaction, Baker assumed that it was no longer a problem.  Baker Dep. 162-66.  Baker continued to teach I.G. at Oak Ridge after receiving the written warning.  Baker Dep. 142-43.

### F.  *Performance Improvement Plan and Termination Meeting*

After getting the written warning, Baker contacted Lane McCleary, Life Time's national tennis director, to set up a meeting.  Baker Dep. 135-36, 155, 190; Baker Dep. Ex. 9 at 3.  Baker asked whether she could bring a lawyer to the meeting; she was told that she could, but she later decided not to do so.  Baker Dep. 190-91.

Brekken, for his part, began working on a performance improvement plan ("PIP") for Baker.  Brekken Dep. 46-47.  Brekken consulted with McCleary, Schultheis, and Life Time's in-house legal counsel.  Brekken Decl. ¶ 9.  McCleary took notes on various concerns to be included in the PIP, including Baker's failure to discuss her outside employment with management; her work with Life Time members at country clubs to which the members did not belong; her failure to sign the summer-leave agreement; and her going over Brekken's head to complain to McCleary.  Brekken Decl. Ex. 1.

Before Brekken finished drafting the PIP, he learned that three Life Time members had called the front desk to complain about Life Time's treatment of Baker. Brekken Dep. 47, 55-56. After hearing this, Brekken decided not to issue the PIP. Brekken Decl. ¶ 10. Instead, together with Schultheis and Life Time's in-house counsel, Brekken decided that Baker should be terminated. Brekken Dep. 61. Brekken made the decision on the basis of Baker's complaining to Life Time members about employment issues; her failure to sign and abide by the written warning; her failure to provide a list of Life Time members training at Oak Ridge; continuing communication problems; and her going over Brekken's head to complain to McCleary. Brekken Decl. ¶ 10; Brekken Dep. 51-52.

On July 20, Baker met with Brekken and Schultheis, with McCleary participating by phone. Baker Dep. 121, 203. Baker complained about being given a "final" warning without having received any other warnings. Baker Dep. 207. She also contended that some of the alleged misconduct had never occurred, which apparently was a reference to the court-scheduling issue listed on the written warning. Baker Dep. 207-08; Baker Dep. Ex. 9 at 3. Schultheis responded that he felt that the violations were serious and did not require initial warnings. Baker Dep. Ex. 9 at 3. Schultheis also said that he could document whatever he wanted, regardless of whether it had occurred. Baker Dep. Ex. 9 at 3.

Baker asked to see the policies that required her to inform Life Time of outside employment. Baker Dep. Ex. 9 at 3. Baker said that she would sign the written warning if it were rephrased (apparently to remove any mention of scheduling court time) and also challenged a claim by Brekken that she had scheduled court time that she failed to use. Baker Dep. 138-39, 202-04, 209; Baker Dep. Ex. 9 at 3. Finally, Baker was asked whether she had told Life Time

members that she might be terminated.  Baker Dep. 201-02; Baker Dep. Ex. 9 at 3.  After Baker confirmed that she had, Schultheis told her that she was being fired.  Baker Dep. 201-02; Baker Dep. Ex. 9 at 3.

When Baker asked why she was being fired, Schultheis responded, "I do not have to have a reason, and nor do I have a reason to tell you."[5]  Baker Dep. 212.  Schultheis also told Baker that she would not be getting a written explanation for her termination.  Baker Dep. 212-13.  The next day, Baker called Life Time's human-resources department to ask why she had been terminated and was told that she had been terminated for having another job.  Baker Dep. 130-31.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.

### B.  Baker's Claims

---

[5]Baker does not refer to this testimony in her brief or otherwise claim that Life Time has failed to offer a legitimate, nondiscriminatory reason for her termination.  Because Baker treats this testimony as irrelevant, the Court follows suit.

The parties agree that Baker's claims should be analyzed under the familiar three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which applies to both Title VII and MHRA claims. *Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013).

Under that framework, a plaintiff who alleges race discrimination must show that (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 792 (8th Cir. 2011). A plaintiff can establish the fourth element in various ways, such as through evidence that the employer's asserted reason for the adverse action was pretextual or evidence of racist comments by a decisionmaker. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) ("Evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case.").

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Barber*, 656 F.3d at 792. If the employer meets this burden, then the burden shifts back to the plaintiff to show that the proffered reason was a pretext for discrimination. *Pye*, 641 F.3d at 1019. "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake*, 596 F.3d at 874.

According to Brekken, he decided to terminate Baker after he heard that Baker had complained to Life Time members about her employment issues with her supervisors. Brekken Decl. ¶ 10. Brekken also took into account Baker's failure to sign and abide by the written warning, her failure to provide a list of Life Time members whom she was training at Oak Ridge, the continuing communication problems he was having with her, the fact that she went over his head to complain to McCleary, and her previous conduct in entangling A.J. in an employment issue. Brekken Decl. ¶ 10; Brekken Dep. 52.

To meet the fourth element of her prima facie case, Baker cites what she contends is evidence that these reasons are pretextual. Specifically, she argues that there was no formal summer leave-of-absence program or written agreement; that she had Brekken's approval before she started working at Oak Ridge; that white employees were not disciplined or terminated for similar policy violations; that various alleged instances of misconduct were not really misconduct; and that Life Time's stated reasons for terminating her have changed over time. The Court considers each argument in turn.

### 1. Formal Summer Leave-of-Absence Program and Program Agreement

Baker first argues that there is an issue of fact concerning whether Life Time had a formal leave-of-absence program or a written leave-of-absence agreement. But although some of Baker's deposition testimony suggests otherwise, Baker does not dispute that she was required to communicate her summer plans to Brekken at some point and that she was not supposed to teach Life Time members at a country club unless the member was also a member of the club. As Baker states in her brief:

> The actual standard regarding the Conflicts of Interest
> policy and leave for the summer in 2010 (looking at the above

-11-

> evidence in the light most favorable to Baker) was that Life Time tennis professionals knew they must, at some point, communicate their summer plans to Brekken; they also knew teaching Life Time members at a country club, unless they were members, was considered inappropriate.

ECF No. 19 at 7 (footnote omitted). In addition, Baker admittedly received and reviewed a copy of Life Time's written conflict-of-interest policy, which, among other things, stated that "[o]ffering services that are normally provided in the course of your employment outside of Life Time Fitness premises without prior approval from your supervisor or manager" could be considered a conflict of interest. Baker Dep. Ex. 8 at 19-20.

The conflict-of-interest policy that Baker describes in her brief is precisely the conflict-of-interest policy that was applied to Baker. Whether or not that policy was embodied in a formal leave-of-absence agreement that tennis pros were supposed to sign is irrelevant. Baker was not disciplined or terminated for failing to sign a leave-of-absence agreement. Instead, she was disciplined and terminated for (among other things) failing to follow the conflict-of-interest policy. Because it is undisputed that this policy was in force (regardless of the extent to which it was reduced to writing) — and because it is undisputed that Baker violated this policy — any dispute over whether this policy appeared in a written leave-of-absence agreement that tennis pros were supposed to sign is immaterial.

True, there is evidence that Life Time wanted Baker to sign the leave-of-absence agreement. Specifically, McCleary's notes and July 8 email reflect that, as part of the PIP that Brekken was preparing in the wake of the written warning, Life Time intended to ask Baker to sign the leave-of-absence agreement. Brekken Decl. Ex. 1. But this is not the same as evidence that Baker was disciplined or terminated because she had previously failed to sign the

agreement. Rather, it indicates that Life Time intended to allow Baker to sign the agreement in July, after she had already been working at Oak Ridge for over a month. It is undisputed that Brekken never completed the PIP nor presented it to Baker, and there is no evidence that Life Time ever cited Baker's failure to sign the leave-of-absence agreement as a reason for her later termination. Because Baker's discipline and termination had nothing to do with her failure to sign the agreement, Baker's argument regarding the agreement is a red herring.

Even if McCleary's notes could be considered evidence that Life Time intended to treat Baker differently — by asking her to sign a leave-of-absence agreement that, according to Baker, did not previously exist — a jury could not infer pretext on that basis. As described below, Baker was the *only* tennis pro who was known by management to have taught a Life Time member at a country club to which the member did not belong. Thus, Life Time was unquestionably justified in treating Baker differently from other tennis pros in this respect.

Finally, Baker argues that, even if the leave-of-absence agreement existed, evidence that Life Time never asked any of its tennis pros to sign it demonstrates pretext because it shows that Life Time failed to follow its own policies. The Court disagrees. When an employer's failure to follow its own policies affects all employees, such failure is not evidence of pretext. *See Floyd v. Mo. Dep't of Soc. Servs.*, 188 F.3d 932, 937 (8th Cir. 1999).

## 2. Brekken's Prior Approval

Baker next argues that Brekken actually knew and approved of her work at Oak Ridge and that Life Time's reliance on her failure to notify him is therefore pretextual. In her deposition, Baker testified that she never told Brekken of her work at Oak Ridge. Baker Dep. 103. In a later declaration, however, Baker asserts that Brekken was in the room when

Baker told a Life Time member about her plan to teach at Oak Ridge. Baker Decl. ¶ 5. Baker assumes that Brekken overheard this conversation and contends that, by failing to object to her plan, Brekken implicitly approved it.

Baker's declaration contradicts her earlier deposition testimony. At her deposition, Baker not only testified that she never told Brekken of her work at Oak Ridge, but she also agreed that she did not have "open conversations about where" she was going to work that summer and further testified that she "did not tell anybody until [Brekken] actually approached " her about her work at Oak Ridge. Baker Dep. 93, 146. Baker's statement in her later declaration that she discussed her Oak Ridge employment with a Life Time member in Brekken's presence directly contradicts this earlier sworn testimony and therefore cannot create a genuine issue of fact. *See Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010) (a party cannot create a genuine issue of fact by filing an affidavit contradicting her earlier testimony).

Even if the Court were to consider the statement in Baker's declaration, it would not be sufficient to create a material issue of fact. Whether or not Brekken overheard a discussion about Baker's plan to work at Oak Ridge, the fact remains that Baker did not directly inform Brekken of her plans or obtain his express approval. The issue is not whether Baker complied with the spirit (although not the letter) of Life Time's conflict-of-interest policy, nor whether Life Time's expectation that Baker obtain Brekken's express approval is sensible or fair. Instead, the issue is whether a jury could find that Life Time's reliance on Baker's failure to meet these standards is a pretext for discrimination. No reasonable jury could so find. There is no dispute that Baker violated the conflict-of-interest policy by failing to directly inform Brekken of her summer plans and by failing to obtain his express approval. Moreover, as

explained below, there is no evidence that Life Time applied the conflict-of-interest policy inconsistently. Baker's contention that Brekken overheard and implicitly approved her summer plans is therefore insufficient to create a material factual issue.

### 3.  Similarly Situated Employees

Baker next argues that similarly situated white employees — Barb Meyer and Alyssa Lauristen — were not disciplined or terminated even though they also taught I.G. at Oak Ridge. The problem with this argument, though, is that there is absolutely no evidence that Brekken or any other Life Time manager *knew* that Meyer or Lauristen taught I.G. at Oak Ridge. Brekken testified that he did not know whether Meyer taught I.G. at Oak Ridge or whether Lauristen even worked at Oak Ridge. Brekken Dep. 41, 43-44. Baker did not tell Brekken or anyone else at Life Time that Meyer, Lauristen, or any other tennis pro taught I.G. (or any other Life Time member) at Oak Ridge. Baker Dep. 148-51. Nor does Baker have any other evidence that Brekken knew of this alleged misconduct by Meyer and Lauristen.

Baker nevertheless contends that Brekken must have known that Meyer was violating Life Time's policies because Brekken knew that Meyer was the director of Oak Ridge's summer tennis program and because I.G. was enrolled in that program. But Brekken did not know whether I.G. was enrolled in the Oak Ridge summer program, as opposed to merely taking private lessons from Baker at Oak Ridge. Brekken Dep. 44. Without evidence that Brekken or any other Life Time manager was aware that other tennis pros were teaching I.G. at Oak Ridge — or even that Brekken knew that I.G. signed up for the program that Meyer directed — Life Time's failure to discipline or terminate other tennis pros for engaging in such conduct does not establish pretext.

Finally, even if Baker could show that Life Time knew of *some* misconduct by other tennis pros, Baker cannot identify any other tennis pro who committed *all* of the types of misconduct that she committed. In order to demonstrate pretext, Baker must show that Meyer and Lauristen are "similarly situated [to Baker] in *all* relevant respects." *Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013) (quotation omitted and emphasis added). But Baker cannot show that Meyer, Lauristen, or any other tennis pro involved clients in employment disputes with Life Time. Baker concedes that she asked A.J., a teenage Life Time member, about the complaint that he had allegedly made against her. Baker likewise admits that she told multiple Life Time members that she was upset because she might get fired. All of the evidence suggests that Baker's telling Life Time members that she might get fired was the "last straw" — the incident that finally prompted Life Time to terminate her. Because Baker cannot identify any other tennis pro who engaged in similarly serious misconduct, she cannot show pretext on this basis.

### 4. Other Misconduct

Baker offers various excuses for other instances of her misconduct. For example, she contends that there was no policy against a tennis pro going over Brekken's head to the national tennis director; that it was appropriate for her to tell Life Time members that she might be fired so that they could plan accordingly; and that she had good reasons not to sign the written warning and not to provide Brekken with a list of Life Time members who trained at Oak Ridge.[6] It is not unlawful, however, for an employer to make decisions that might seem unfair or

---

[6]As noted, Baker seemed to testify at her deposition that Brekken told her that she did not have to provide such a list. But Baker does not refer to this testimony in her brief nor dispute
(continued...)

unreasonable. *See Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices."). Baker's ability to rationalize or excuse her misconduct does not establish pretext.

### 5. Shifting Explanations

Baker does not dispute that Life Time has consistently cited her violation of the conflict-of-interest policy as a reason for her termination, and in her brief she implicitly disavows any argument that Life Time has shifted its explanation for her termination. ECF No. 19 at 8. At oral argument, however, Baker contended for the first time that Life Time has only recently begun to cite Baker's complaints to Life Time members about her employment problems as a reason for her termination. To the extent that Baker contends that this is evidence of pretext, the Court disagrees. It is true that, when Baker called Life Time's human-resources department to ask why she had been terminated, the representative who answered the phone told Baker that it was for having a second job. But Baker does not dispute that, immediately before she was terminated, she had confirmed to her managers that she had told Life Time members that she might be terminated. Under these circumstances, the fact that a human-resources representative did not mention her inappropriate conversations with Life Time members when Baker called the next day is insufficient to prove that Life Time did not in fact rely on those conversations in deciding to terminate her.

---

[6](...continued)
that she was supposed to provide a list; instead, she contends that her concerns about members' privacy justified her failure to provide the list.

*C. Conclusion*

Taking the evidence in the light most favorable to Baker, a jury could find that Life Time's management did not do a good job of communicating with her. But there is simply no evidence from which a jury could infer that Brekken fired Baker because she is black. It is undisputed that Baker violated Life Time's policies by failing to get Brekken's permission before working at Oak Ridge and by teaching a Life Time member at Oak Ridge even though that member did not belong to Oak Ridge. It is also undisputed that Baker involved multiple Life Time members (including a teenager) in internal employment issues and went over Brekken's head to complain to Life Time's national tennis director. These are all legitimate reasons for terminating Baker, and there is no evidence from which a jury could find that these reasons were pretextual — particularly because there is no evidence that any other Life Time employee engaged in similar misconduct. Life Time's motion for summary judgment is therefore granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [ECF No. 13] is GRANTED.
2. Plaintiff's complaint [ECF No. 1-1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 19, 2014           s/Patrick J. Schiltz
                                  Patrick J. Schiltz
                                  United States District Judge